United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JOSE GUERRA,

      Petitioner,

      v.

M. MARTEL, Warden,

      Respondent.

Case No.: C 10-4800 CW (PR)

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY

    Petitioner Jose Guerra, a California prisoner proceeding pro se, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the validity of his state conviction, in which he asserts two claims: (1) insufficient evidence and (2) ineffective assistance of counsel.  Respondent filed an answer and a memorandum of points and authorities in support thereof. Petitioner responded with a traverse and a request for an evidentiary hearing.  Having considered all of the papers filed by the parties, the Court DENIES the petition and the request for an evidentiary hearing.

BACKGROUND

I. Procedural History

    On August 24, 2006, a Santa Clara County jury found Petitioner guilty of assault with a deadly weapon on a peace officer, exhibiting a weapon at a peace officer with intent to

resist arrest, inflicting corporal injury on a spouse, two counts of criminal threats, two counts of battery and first degree burglary.  Court Transcript (CT) at 789-813.  On August 28, 2006, Petitioner admitted he had two prior serious felony convictions, and two prior strike convictions and had served two prior prison terms.  CT at 821.  On December 14, 2006, the trial court sentenced Petitioner to seventy-five years to life consecutive to a twenty-year term.  CT at 989-990.

Petitioner appealed to the California Court of Appeal the claim that insufficient evidence supported the criminal threats convictions.  On June 17, 2008, in an unpublished opinion, the California Court of Appeal affirmed the judgment.  Resp. Ex. 6, People v. Guerra, 2008 WL 2430046.  Petitioner filed a petition for review in the California Supreme Court, which was denied on September 10, 2008.  Resp. Exs. 7 and 8.

Petitioner then filed a petition for a writ of habeas corpus in the Santa Clara County Superior Court asserting a claim of ineffective assistance of counsel.  Pet., Ex. 4.  On October 23, 2009, the Superior Court denied the petition in a brief written order.  Id.  On December 7, 2009, Petitioner filed a petition for a writ of habeas corpus in the California Court of Appeal, which was summarily denied on January 5, 2010.  Pet., Ex. 5.  On February 10, 2010, Petitioner filed a petition for a writ of habeas corpus in the California Supreme Court, which was summarily denied on August 18, 2010.  Pet. at 5.

II. Statement of Facts

The California Court of Appeal summarized the facts of this case as follows:

Prosecution Case

Defendant's sister Rosario Cabrera lived with her husband, Jose Luis Portillo, her daughter, Susie Caustrita, and her two- or three-year-old great nephew (defendant's grandson), Gabriel, at the Hilton Mobile Home Park in San Jose. Defendant lived with his wife, Elisa Guerra, FN3 in Modesto.

> FN3 Hereafter, for clarity and ease of reference, we shall refer to Mrs. Guerra as "Elisa."

On January 29, 2005 Cabrera threw a surprise 55th birthday party for defendant at the recreation room of the mobile home park. By all accounts, both defendant and his wife were extremely intoxicated. Witnesses testified that defendant drank at least eight shots of Tequila.

Around midnight, defendant became upset and started arguing with Cabrera because he thought Portillo was cheating on Cabrera. Defendant started throwing food, turning over food plates, screaming at the party-goers, calling people names, and "hitting everybody." He broke one of the plate glass windows in the recreation room.

Defendant was punching Elisa and throwing her around the recreation room. When Cabrera tried to stop him, defendant bit Cabrera's forearm. He also punched Cabrera in the mouth. The evidence included photographs of a bite mark on Cabrera's left arm and Cabrera's swollen lip.

The day after the incident, Elisa visited defendant in jail and they talked about what had happened at the party. Their conversation was recorded and the jury heard the recording. Elisa told defendant that she "got a fat lip and . . . a bunch of knots on [her] head." She also said she had a black eye. He asked her if she had tried to hold him back and she told him he was fighting with her first, but she did not know why he was mad at her. She told him that he had hit his sister Victoria, that he was "going after" his sister Lupe, that he kicked Caustrita, and that he was fighting with someone named Evaristo. Defendant admitted that he tried to "poke out" Pollo's eye. Pollo's relationship to defendant is not clear. He was a party guest. Caustrita told a police officer that defendant had kicked her in her left leg.

Cabrera, Portillo, and Caustrita left the party, fled to their mobile home, and locked the doors. Caustrita hid in a closet with Gabriel. Caustrita called 911 at 12:29 a.m. on January 30, 2005. The jury heard a recording of the 911 call. Caustrita told the 911 operator that defendant had hit her and "all his sisters." Defendant's sisters Victoria and Lupe were at the party.

Defendant followed his family members to the mobile home. During the 911 call, Caustrita reported that defendant was

"circling the neighborhood" and was "trying to get into the house." She told the 911 operator that he had "already broke[n] three windows," that he was "trying to break windows," and that he "broke a window." The evidence included photographs of one broken window.

Six times, Caustrita asked the operator to "hurry." At different times during the call, Caustrita told the operator she was "afraid," "really afraid," and "really scared." After Caustrita had been on the line with the 911 operator for about six minutes, she reported that defendant was "trying to break down the door" and that he had entered the house. The evidence included a photo of a muddy boot print on the front door. As defendant entered the mobile home, he screamed "I'm going to kill you."

After he was inside, Caustrita told the 911 operator that defendant was hitting Cabrera. On the recording, the jury heard defendant yelling at Cabrera and Cabrera crying and pleading with defendant. There was a loud scream and then Caustrita stated, "Oh my God, he said he's going to kill her." The jury could hear defendant yelling at Cabrera and calling her "stupid" in Spanish. Caustrita told defendant he was scaring Gabriel.

Four police officers responded to the 911 call. When they arrived, they heard screams coming from the mobile home. The officers saw Portillo running away from the mobile home. FN4 Portillo "frantically" waved the officers down and said, "He's inside attacking my wife."

> FN4 According to Caustrita, Portillo "ran for his poor life."

Officer Alford and Officer Carranza entered the mobile home through an open door and found defendant in the hall with the neck of a broken beer bottle in his hand. Defendant's hands were covered with blood and the bottle was bloody.

Defendant lunged at the officers with the broken bottle. Officer Alford yelled at defendant to "Drop it!" Defendant did not comply and Officer Alford shot defendant in the chest with a taser. The taser did not work and Officer Alford told Officer Carranza to shoot defendant. Defendant tossed the broken bottle into a bathroom. Officer Carranza did not shoot defendant.

Defendant made a fist and put his hands in front of him, indicating that he wanted to fight. Officer Carranza grabbed his baton and told defendant to get on the ground. Defendant ended up face down on the floor and was kicking the officers. Officer Bui shot defendant in the buttocks with his taser. The second taser shot did not seem to have any effect on defendant. The officers used their batons to subdue defendant and eventually took him into custody.

**United States District Court**
For the Northern District of California

Caustrita told Officer Alford that when defendant was in the mobile home, he threatened to kill Portillo.  While she was being interviewed by the officer, she took a phone call from someone named Abbey and told Abbey that defendant wanted to kill Portillo.

Defendant called Cabrera's home from jail at 4:29 a.m. on January 30, 2005.  Cabrera answered the phone.  Defendant asked her to put his wife, Elisa, on the phone and told Cabrera, "What [sic] I want to talk to you?  I don't want to talk to that piece of shit you are married to.  He's dead as soon as I can get a hold of him.  Fucking cop calling bitch."  Cabrera then handed the phone to Elisa.

Defendant told Elisa to go home because he did not want her staying at Cabrera's house.  He stated "I don't want you to be around that fucking punk.  And he is dead.  You hear me?"  Defendant was angry that Portillo had called the police.

Defendant called back at 4:36 a.m.  This time, Elisa answered the phone.  He asked her why the police had "tased" him and she said she did not know.  He asked her who he was fighting with and she told him he was "just hitting everybody. . . ."  When he asked her why he was hitting everybody, she said that he was mad and that she did not know why he was mad.  Defendant stated he did not want "to see you guys again" if they left him in jail.  He then stated, "I'm gonna go fuck up Joe Luis."  FN5  Defendant could not remember what had happened and stated "something happened with me and Jose Luis" because he was the one that had called the police.  Defendant stated "I'm going to fuck him up when, when I get out" and "he's going to be a sorry mother fucker when I get out."  Later in the conversation, he said, "And we're never going to go down there again.  Fuck Rosemary  FN6  and fuck him.  I'm going to go over there. . . . I'm going to fuck that punk up."

> FN5 Defendant referred to Portillo as both "Joe Luis" and "Jose Luis."

> FN6 Defendant's sister Rosario Cabrera also used the name "Rosemary."

Elisa told defendant she planned to see him in the morning. He told her to leave "Jose Luis's house 'cause I'm going to fuck that punk up. . . . [T]ell Rosemary I don't give a fuck if she loves him or not he put me in jail, . . . he better fucking get me out or I'm gonna fuck him up."  Defendant continued: "You tell him I said if he don't get me out I'm gonna fuck him up.  I'm gonna fuck him up not one time, I'm going to fuck him up every time I see him."

At trial, Elisa testified that defendant was not upset that night.  She could not recall defendant getting into a fight or hitting or threatening anyone.  She did not see him bite Cabrera or break a beer bottle.  She did not recall defendant

ever hitting her.  Likewise, Caustrita testified that she did not recall much of what happened in the mobile home.

Cabrera testified that she did not tell the police that defendant bit her, that she did not know how she got the mark on her wrist, and that it looked like a burn, not a bite. She also did not recall telling the police that defendant hit her in the mouth or how her lip got swollen.  She testified that defendant accidentally broke the window when he fell over an exercise bicycle and that she opened the door and let him in.  She could not recall defendant saying that he was going to kill Portillo.

Resp. Ex. 6 at 2-7 (footnotes in original).

LEGAL STANDARD

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996, a district court may not grant habeas relief unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412 (2000).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  Williams, 529 U.S. at 412-13.  A state court decision is an "unreasonable

application of" Supreme Court authority, under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ. Id. at 409.  Under AEDPA, the writ may be granted only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents." Harrington v. Richter, 131 S. Ct. 770, 786 (2011).

Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003), overruled in part on other grounds by Lockyer v. Andrade, 538 U.S. 63 (2003).

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  A petitioner must present clear and convincing evidence to overcome the presumption of correctness under § 2254(e)(1); conclusory assertions will not do. Id.

If constitutional error is found, habeas relief is warranted only if the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" Penry v. Johnson, 532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S.

United States District Court
For the Northern District of California

619, 638 (1993)).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion of the highest court to analyze whether the state judgment was erroneous under the standard of § 2254(d). Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991).  In the present case, the highest court to issue a reasoned decision on the insufficient evidence claim is the California Court of Appeal and the highest court to issue a reasoned decision on the ineffective assistance of counsel claim is the Santa Clara Superior Court.

DISCUSSION

I. Sufficiency of Evidence Regarding Criminal Threats Convictions

Petitioner was convicted of two counts of violating California Penal Code section 422 for making criminal threats against Rosario Cabrera and Jose Luis Portillo.  Petitioner contends the evidence was insufficient to show that Cabrera and Portillo experienced the "sustained fear" required by section 422.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt states a constitutional claim, which, if proven, entitles him to federal habeas relief.  Jackson v. Virginia, 443 U.S. 307, 321, 324 (1979).

A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the

evidence established guilt beyond a reasonable doubt.  Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992).  Nor does a federal habeas court in general question a jury's credibility determinations, which are entitled to near-total deference. Jackson, 443 U.S. at 326.  If confronted by a record that supports conflicting inferences, a federal habeas court "must presume —— even if it does not affirmatively appear in the record —— that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  Id.  The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  Payne, 982 F.2d at 338 (quoting Jackson, 443 U.S. at 319).  Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted. Jackson, 443 U.S. at 324.  The Supreme Court has recently emphasized that "Jackson claims face a high bar in federal habeas proceedings . . ."  Coleman v. Johnson, 132 S. Ct. 2060, 2062 (2012) (per curiam).

After AEDPA, a federal habeas court applies the standards of Jackson with an additional layer of deference.  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  To grant relief, a federal habeas court must conclude that "the state court's determination that a rational jury could have found that there was sufficient evidence of guilt, i.e., that each required element was proven beyond a reasonable doubt, was objectively unreasonable."  Boyer v. Belleque, 659 F.3d 957, 965 (9th Cir. 2011).

**United States District Court**
For the Northern District of California

Sufficiency of the evidence claims are reviewed with reference to the substantive elements of the criminal offense as defined by the state law.   Jackson, 443 U.S. at 324 n.16.

The California Court of Appeal found there was sufficient evidence to support the convictions under section 422, as follows.

General Principles

To prove a violation of section 422, the prosecution must establish "(1) that [defendant] 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that [he] made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat——which may be 'made verbally, in writing, or by means of an electronic communication device'——was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." (People v. Toledo (2001) 26 Cal. 4th 221, 227-228, emphasis added.) Surrounding circumstances that should be taken into account to determine if a threat falls within the proscription of section 422 include the defendant's mannerisms, affect, and actions involved in making the threat as well as subsequent actions taken by the defendant. (People v. Solis (2001) 90 Cal. App. 4th 1002, 1014.)

Defendant argues that the evidence was insufficient to show that Cabrera or Portillo experienced the "sustained fear" required by section 422.

"The phrase to 'cause [ ] that person reasonably to be in sustained fear for his or her own safety' has a subjective and an objective component.   A victim must actually be in sustained fear, and the sustained fear must also be reasonable under the circumstances." (In re Ricky T. (2001) 87 Cal. App. 4th 1132, 1140.)  "Defining the word 'sustained' by its opposites, we find that it means a period of time that extends beyond what is momentary, fleeting, or transitory." (People v. Allen (1995) 33 Cal. App. 4th 1149, 1156 [requirement met where defendant was arrested 15 minutes after making armed threat to kill victim and her daughter].) The victim's knowledge of the prior conduct of the person making the threat is relevant in proving that the victim was in a state of sustained fear.  (Ibid.)  The fact that the

victim is sufficiently frightened to call the police indicates that he or she feared for his or her safety. (<u>People v. Melhado</u> (1998) 60 Cal. App. 4th 1529, 1538.)

The period of sustained fear must "'extend[ ] beyond what is momentary, fleeting, or transitory.'" (<u>In re Ricky T.</u>, 87 Cal. App. 4th at 1140 [fear that did not extend beyond the moments of the threatening encounter was not sufficiently sustained], quoting <u>Allen</u>, 33 Cal. App. 4th at 1156.) A victim's knowledge of the defendant's prior conduct is relevant to the question of whether the victim suffered from sustained fear. (<u>In re Ricky T.</u>, 87 Cal. App. 4th at 1140 [court relied on evidence that the victim had knowledge of the defendant's prior threatening conduct and had reported this conduct to the police several times].) Circumstances surrounding a threat can help show whether the fear was "sustained." (<u>Ibid.</u> [lack of specificity of threat and victim's failure to report threat to police until next day indicate fear was not sufficiently sustained; an assailant's having followed through on threats supports conclusion that fear was sustained]; . . . Evidence of actual fear may include the victim's testimony or be demonstrated by the victim's conduct. (<u>People v. Renteria</u> (1964) 61 Cal. 2d 497, 499.)

Defendant contends that his threat convictions must be reversed because, with respect to threats in the mobile home, the evidence is insufficient to establish that Cabrera and Portillo were in sustained fear of defendant's threats since the police arrived and took control of the situation less than one minute after the threat was made and because neither Cabrera nor Portillo testified that they were actually in sustained fear of the threat.  Defendant argues, with respect to the threats on the phone, there is no evidence the threats were communicated to Cabrera or Portillo or that either one of them was in sustained fear as a result of the threats.

After examining all of the factors outlined above, we conclude that there is sufficient evidence to support the jury's findings that Cabrera and Portillo experienced a state of sustained fear for Cabrera's safety, Portillo's safety, or the safety of other household members.  We shall discuss the evidence relevant to each of the counts at issue.

Rosario Cabrera (Count 4)

Fueled by alcohol, defendant went on a rampage in the recreation room.  He turned over trays of food, hit his wife in the face and the head, screamed at other guests, and broke a window.  He bit Cabrera's forearm when she tried to hold him back and prevent him from hitting his wife and struck Cabrera in the face.  He hit his other sister, Victoria, and kicked Caustrita.

Cabrera, her husband, and her daughter fled to the safety of their home and locked the doors. Cabrera was sufficiently frightened by the situation to call 911. The 911 operator told Caustrita that Cabrera had called to report the disturbance, but had hung up. The terror inherent in the situation escalated when defendant followed Cabrera and Portillo to their home and began circling the house, trying to find a way in. He broke a window, kicked in the door, and entered the house with a broken, bloody bottle in his hand. He threatened to kill both Cabrera and her husband.

The recording of the 911 call is eight minutes, 14 seconds long. At the six-minute mark, Caustrita told the 911 operator that defendant was in the house. From that point on, the jury heard defendant yelling at Cabrera and Cabrera screaming and crying and saying "Joe, please don't." At the six-minute 45-second mark, Caustrita reported that defendant had threatened to kill Cabrera.

Cabrera reported defendant's threat to kill her to Officer Heinrich when he interviewed her after defendant was removed from her home. The fact that she considered it relevant even after defendant was removed from her home supports the conclusion that her fear of defendant was more than momentary, fleeting, or transitory.

Defendant continued to threaten to kill Portillo in his telephone calls from jail, approximately four hours after he threatened Cabrera in her home. When Cabrera answered the phone, defendant told her "[Portillo]'s dead as soon as I can get a hold of him." Elisa told defendant that Cabrera would not visit him in jail because of what he said to her during the phone call and because he had threatened to kill Portillo.

There was also evidence that defendant had assaulted Cabrera in the past. Cabrera told Officer Heinrich that defendant had gotten violent with her in the past while drinking and had assaulted her physically.

At trial, Cabrera changed her story and testified to something completely different from what she told the police on the night of the incident. The jury could reasonably infer from the fact that she had changed her story that she was still afraid of defendant.

The terrifying nature of the situation under which the threats were made (defendant had just broken a window and kicked in the door to Cabrera's home with a broken, bloody bottle in his hand), Cabrera's emotional state at the time the threats were made (she is screaming and crying and pleading with defendant), and the facts that she reported the threats to the police, avoided seeing defendant the day after the event, and lied at trial support the jury's finding that her fear was more than momentary, fleeting or transitory.

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Jose Luis Portillo (Count 5)

Defendant was out of control at the party and his relatives' efforts to control him were met with physical abuse. Although Portillo testified that he was not at the recreation hall when defendant began hitting everyone, Cabrera told Officer Heinrich that both she and Portillo tried to stop defendant and get him under control before they fled to their home. Portillo fled to the safety of his home, only to have defendant break in and threaten to kill him. As we noted above, the circumstances under which the threat was made were particularly terrifying. Defendant kicked in the door and screamed "I am going to kill you" as he entered Portillo's home. Defendant's hands were bloody and he had a broken bottle in his hand. Cabrera was screaming for him to stop as Portillo ran out the back door. The officers saw Portillo running away from the mobile home seconds before they entered. Officer Heinrich testified that Portillo "frantically" waved them toward the mobile home and stated, "He's inside, attacking my wife." The officers testified that they heard screams coming from inside the home as they entered.

With regard to Portillo, it is relevant that he was the primary focus of defendant's anger, since it was the allegation that Portillo was cheating on defendant's sister that sparked defendant's anger and his ensuing rampage. Caustrita told Officer Alford that the allegations of Portillo's infidelity were true.

Defendant argues that Portillo did not even know that defendant threatened to kill Portillo when he spoke to Cabrera and Elisa by phone a few hours after his arrest. However, when she visited him in jail, defendant told Elisa to tell Portillo that he had threatened him the second time because he believed that Portillo had called the police. Elisa responded "I told him already."

Portillo, like the other witnesses, lied on the stand about what happened on the night of the incident. Portillo testified that he went to the party, had something to eat, and then went home. He said he spent the rest of the night at home and did not hear anyone, including his wife, screaming. He did not hear anyone break a window or kick in a door. Portillo's incredible testimony supports an inference that he was still afraid of defendant when he testified at trial.

In our view, this evidence was sufficient to support the jury's conclusion that Portillo's fear, after being threatened by defendant in the mobile home, was more than momentary or fleeting.

Resp. Ex. 6 at 8-13.

United States District Court
For the Northern District of California

Viewing the evidence in the light most favorable to the prosecution, it is clear that a rational trier of fact could have found that Cabrera and Portillo experienced sustained fear as a result of Petitioner's threats.  As explained by the California Court of Appeal, sustained fear requires that the victim experience fear for a period of time beyond what is momentary, fleeting or transitory.  See Ricky T., 87 Cal. App. 4th at 1140. Fifteen minutes has been found to be sufficiently beyond momentary or fleeting.  See Allen, 33 Cal. App. 4th at 1156.  To determine if the fear is sustained, the trier of fact may consider the defendant's mannerisms, affect and actions involved in making the threat, the victim's knowledge of the defendant's prior conduct, whether the victim called the police, and the victim's conduct and testimony.  See Solis, 90 Cal. App. 4th at 1014 (defendant's conduct); Ricky T., 87 Cal. App. 4th at 1140 (prior conduct); Melhado, 60 Cal. App. 4th at 1538 (call to police); Renteria, 61 Cal. 2d at 499 (victim's conduct and testimony).

Petitioner argues that the evidence is insufficient to show either victim was in sustained fear because Caustrita called the police, not the two victims.  However, the evidence shows that Cabrera originally called the police, but hung up after she reported Petitioner's behavior.  That Portillo did not call the police is not indicative of lack of sustained fear because he fled from the recreation hall, where Petitioner was physically out-of-control and threatening Portillo, to the supposed safety of his own home.  However, when Petitioner left the recreation hall, broke into Portillo's home and continued to threaten him, Portillo ran out the back door, again fleeing from Petitioner.

United States District Court
For the Northern District of California

Petitioner points out that the police arrived at the scene and subdued Petitioner only forty-two seconds after Caustrita reported to the 911 operator that Petitioner threatened to kill Cabrera.  He argues that a fear that lasts only forty-two seconds is fleeting and is insufficient to constitute "sustained" fear.  However, Petitioner overlooks his behavior before and after he actually threatened to kill Cabrera.  During Petitioner's birthday party, he started arguing with Cabrera because he learned that Portillo was cheating on her.  Petitioner turned over trays of food, hit his wife in the face and head, screamed at guests, broke a window and bit Cabrera's forearm and struck her in the face when she tried to hold him back from hitting his wife.  Petitioner also hit his other sister, Victoria, and kicked Caustrita.

Cabrera and Portillo became fearful of Petitioner as a result of his behavior in the recreation room, as evidenced by their fleeing from the party and taking shelter in their home.  Petitioner followed Cabrera and Portillo to their home, kicked in the door while holding a broken bottle and screaming "I'm going to kill you."  He immediately began hitting Cabrera.  On the recording of Caustrita's 911 call, the jury heard Petitioner yelling at Cabrera and heard Cabrera crying and pleading with Petitioner.  Portillo told police, as he fled from his house in fear of Petitioner, that Petitioner was in the house attacking Portillo's wife.  Thus, Portillo was not only fearful that Petitioner would harm him, but that he would harm Cabrera, his wife.  See Cal. Penal Code § 422 (threat caused person to be in sustained fear for his or her own safety or safety of his or her immediate family).  Petitioner's continued threats against Portillo from jail added to the fear Petitioner instilled in both

15

United States District Court
For the Northern District of California

Portillo and Cabrera as a result of his threats on the night of the party.  That both Cabrera and Portillo lied on the witness stand about the events that occurred that night is further evidence that they experienced sustained fear from Petitioner's threats.

Petitioner also argues that the evidence does not show that he hit Cabrera before the police arrived because Cabrera had no serious injuries and both she and Portillo denied the alleged threats at his trial.  However, the jury heard the tape of Caustrita's 911 telephone call which included Petitioner's threats and Cabrera's pleas to stop and chose to disbelieve Cabrera's and Portillo's trial testimony.  Indeed, it was reasonable for the jury to conclude, from the fact that Cabrera and Portillo testified falsely about Petitioner's behavior on the night in question, that they were still in fear of Petitioner.

In sum, viewing the evidence in the light most favorable to the prosecution, Petitioner has failed to show that no rational trier of fact could have found proof of sustained fear beyond a reasonable doubt.  <u>Jackson</u>, 443 U.S. at 324; <u>Payne</u>, 982 F.2d at 338.

The California Court of Appeal's rejection of Petitioner's due process claim alleging insufficient evidence of sustained fear was not contrary to, or an unreasonable application of, clearly established federal law.  Accordingly, Petitioner is not entitled to habeas relief on this claim.

II. Ineffective Assistance of Counsel

Petitioner argues that counsel was ineffective because she failed adequately to investigate and to present a defense of voluntary intoxication and that the state court's denial of this

claim was contrary to and an unreasonable application of
Strickland v. Washington, 466 U.S. 668 (1984).

The Sixth Amendment to the United States Constitution
guarantees not only assistance, but effective assistance, of
counsel.  Strickland, 466 U.S. at 686.  The purpose of the right
is to ensure a fair trial, and the benchmark for judging any claim
of ineffectiveness is "whether counsel's conduct so undermined the
proper functioning of the adversarial process that the trial
cannot be relied on as having produced a just result."  Id.  To
prevail on an ineffective assistance claim, a habeas petitioner
must show that (1) counsel's performance was "deficient," i.e.,
his "representation fell below an objective standard of
reasonableness" under prevailing professional norms, id. at 687-
88, and (2) prejudice flowed from counsel's performance, see id.
at 691-94.

"A court considering a claim of ineffective assistance must
apply a 'strong presumption' that counsel's representation was
within the 'wide range' of reasonable professional assistance."
Harrington v. Richter, 131 S. Ct. 770, 787 (2011) (quoting
Strickland, 466 U.S. at 689).  The standards of both 28 U.S.C.
§ 2254(d) and Strickland are "highly deferential . . . and when
the two apply in tandem, review is doubly so."  Id. at 788
(quotation and citations omitted).  When § 2254(d) applies, "the
question is not whether counsel's actions were reasonable.  The
question is whether there is any reasonable argument that counsel
satisfied Strickland's deferential standard."  Id.

The petitioner must also establish that he was prejudiced by
counsel's deficient performance, i.e., that "there is a reasonable
probability that, but for counsel's unprofessional errors, the

**United States District Court**
For the Northern District of California

result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  <u>Id.</u>  Where the defendant is challenging his conviction, the appropriate question is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." <u>Id.</u> at 695.  "The likelihood of a different result must be substantial, not just conceivable." <u>Richter</u>, 131 S. Ct. at 792 (citing Strickland, 466 U.S. at 693).

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as the result of the alleged deficiencies.  <u>Strickland</u>, 466 U.S. at 697; <u>Williams v. Calderon</u>, 52 F.3d 1465, 1470 & n.3 (9th Cir. 1995).  Likewise, it is unnecessary for a court to address the prejudice prong of the <u>Strickland</u> test if the petitioner cannot establish incompetence under the first prong.  <u>Siripongs v. Calderon</u>, 133 F.3d 732, 737 (9th Cir. 1998).

A difference of opinion as to trial tactics does not constitute denial of effective assistance, <u>United States v. Mayo</u>, 646 F.2d 369, 375 (9th Cir. 1981), and tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available.  <u>Bashor v. Risley</u>, 730 F.2d 1228, 1241 (9th Cir. 1984).  Tactical decisions of trial counsel deserve deference when: (1) counsel in fact bases trial conduct on strategic considerations; (2) counsel makes an informed decision based upon investigation; and (3) the decision appears reasonable under the circumstances.  <u>Sanders v. Ratelle</u>, 21 F.3d 1446, 1456 (9th Cir. 1994).

The Santa Clara Superior Court is the only state court that provided a reasoned decision on this claim.  The court succinctly denied the claim, as follows:

> Petitioner has failed to show either ineffective assistance of counsel or prejudice.  Petitioner first contends that his trial attorney failed to present a defense of intoxication . . . It appears from the jury instructions however that the defense and evidence was [sic] offered where applicable.  It was not offered where voluntary intoxication . . . was not a defense. . . . Petitioner next contends that his attorney failed to conduct an adequate investigation.  Petitioner has failed to show that any of the investigation that he contends should have been done would have resulted in any favorable information.

Pet., Ex. 4, In re Jose Guerra, No. CC580514 (Sup. Ct. Oct. 22, 2009).

The Superior Court's denial of this claim was not an objectively unreasonable application of Strickland.  Petitioner's argument that counsel did not present an intoxication defense is not borne out by the record.  In her opening statement, defense counsel informed the jury that it would hear a great deal of evidence that Petitioner was intoxicated when the charged offenses occurred.  Reporter's Transcript (RT) at 171.  She stated, "At the end of this case I'm going to give you my summation of what I think all these facts mean . . . . I am going to ask you to consider his intoxication.  You have been given an instruction about that. . . It is something you can consider with regard to [some offenses].  With regard to those offenses that apply, I am going to ask you to render a not guilty verdict.  I'm expecting you to."  RT at 171.

Counsel called Halle Weingarten, a qualified expert witness in the field of forensic alcohol analysis.  RT at 704.  Ms. Weingarten testified to the debilitating effects alcohol has on

the brain and the spinal cord.  RT at 705-11.  Counsel asked Ms.
Weingarten a hypothetical question based on the evidence presented
in Petitioner's case:

> Counsel: Now, hypothetically speaking, if I tell you that Mr.
> Guerra, or a subject I'll say, began with a drinking pattern
> of eight shots of tequila at 8:00 P.M. and these observations
> were made of the subject at 1:29 A.M., or I should say
> between 1:00 o'clock A.M. and 3:29 in the morning, would that
> be significant in your rendering an opinion about the level
> of intoxication?  And when I say "level of intoxication," I
> don't mean in numbers, I mean in terms of the general sense
> of use of alcohol you have outlined.
>
> A: Yes.
>
> Q: Could you explain?
>
> A: Well, eight shots of tequila is a fair amount of tequila.
> You don't know the size of the shots, but still tequila is a
> concentrated beverage.  It's forty percent alcohol so it is a
> fairly good dose of alcohol.  And if that were all that were
> ingested and this person is still exhibiting signs, outward
> signs of intoxication at – I'm sorry did you say about 1:30?
>
> Q: 1:00 to 3:00.
>
> A: 1:00 to 3:00 in that neighborhood, he must have had a
> reasonably high blood alcohol concentration during that
> period of time at this maximum to still be exhibiting signs
> that far down the road.  The body does work on getting rid of
> alcohol, but it can only do it at a certain rate, and the
> fact that he was still exhibiting signs that much later in
> time in the time line would indicate that he had a fair
> amount of alcohol on board earlier.

RT at 716-17.

The trial court gave the jury instructions on voluntary
intoxication which it could consider in deciding whether
Petitioner acted or failed to act with the required intent in
regard to: counts 4, 5 and 6, making a criminal threat; count 2,
resisting arrest; count 9, entering a building to make threats or
assault a person with a deadly weapon with force likely to cause
great bodily injury; or the lesser-included offenses of counts 4,
5, and 6.  RT at 830.

1    In her closing argument, counsel emphasized the plethora of

2  evidence indicating that Petitioner was highly intoxicated at the

3  time of the charged offenses.  RT at 863.  She stated:

4       Let's talk about Mr. Guerra's intoxication.  What we know
        from the evidence is he had at least eight shots of tequila
5       at 8:00 P.M.  One witness said he was drinking whatever was
        put in his hand.  We know by 12:23 he came into contact with
6       law enforcement officers.  All the officers testified he was
        intoxicated and Susie told the 911 operator, of course, that
7       he was intoxicated.  Between 1:00 and 3:29 A.M. he was at
        Valley Medical Center with Officer Carranza.  The medical
8       records that you have in evidence have throughout them
        references to intoxication, to alcohol use.
9
        At 4:36 A.M. Mr. Guerra's speech is slurred.  He's obviously
10      volatile.  You heard his voice in the jail call.  So he
        starts drinking at 8:00 P.M. the night before and at 4:36 in
11      the morning he's still exhibiting signs of intoxication.
        Well, what does that mean?
12
        You have evidence from a toxicologist with an enormous amount
13      of experience, a toxicologist who used to work here in the
        county's crime laboratory, and she explained to us what the
14      clinical effects of alcohol are, and the ways in which
        alcohol affects our brain.
15
        She talked about euphoria, . . . the difficulty of
16      interpreting sensory input.  Data processing was also, at low
        levels of alcohol, affected; the ability to understand
17      consequences; judgment impaired, short-term memory problems,
        volatile emotions; and what she referred to as an inability
18      to save, the save button.

19      She also talked to us about what happens to the brain when
        one is intoxicated, and that was a clinical term she used to
20      describe a level of impairment that is above and beyond what
        you would feel when you have low levels of alcohol in your
21      system.  So when she referred to intoxication she meant depth
        perception and visual acuity is affected, reaction time is
22      delayed, gross motor skills are affected. . . .

23      . . .

24      Now, I think the evidence is pretty clear that Joe Guerra was
        intoxicated. . . . Officer Alford told us he didn't even test
25      him because it was obvious to him he was intoxicated. . . .
        Medical personnel at Valley Medical Center was still noting
26      his intoxication and alcohol use two to three hours after the
        event, after the moment that you're being required to look at
27      him to determine whether he was able to form the specific
        intent necessary.

28

RT at 863-68.

Defense counsel then argued how Petitioner's intoxication negated the specific intent required for the jury to convict him on the specific intent offenses.  RT at 879, 881-83.

This record clearly shows that defense counsel focused much of her closing argument on the defense of voluntary intoxication. Because counsel presented a strong voluntary intoxication defense, Petitioner's argument that she did not do so lacks merit.

Petitioner specifically argues that counsel "did not forcefully or seriously argue the question of Petitioner's intoxication and, she did not specifically present or argue such definitive defense, there was no coherent, specific, explanation to the jury that Petitioner was raising the intoxication as a defense with respect to the necessary elements of the offenses which the prosecution had the absolute burden to prove beyond a reasonable doubt . . ."  Pet. at 40.[1]  Although counsel may not have used the exact words Petitioner would have wanted her to use in her closing argument, she covered all the topics Petitioner argues she did not.  Petitioner's argument amounts to no more than a difference of opinion regarding trial tactics, which is insufficient to support a claim of ineffective assistance.  See Mayo, 646 F.2d at 375 (difference of opinion as to trial tactics does not constitute denial of effective assistance); Bashor, 730 F.2d at 1241 (tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available).

_____

[1] Page numbers of Petitioner's filings refer to the numbers provided in the Court's electronic filing system.

United States District Court

For the Northern District of California

Petitioner also argues counsel failed to retain a competent expert. Pet. at 42. However, the record shows that counsel presented Ms. Weingarten, whom the trial court found to be a qualified expert in alcohol analysis and the clinical effects of alcohol in general. RT at 705. State court findings of historical fact are presumed correct, unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); Miller-El v. Dretke, 545 U.S. 231, 240 (2005). Petitioner presents no evidence that Ms. Weingarten was not qualified or competent to testify as an expert on voluntary intoxication and its effects. Ms. Weingarten testified about the effects of alcohol consumption in general and Petitioner's alcohol consumption based on her review of Petitioner's medical records. RT at 709, 715-17.

Petitioner argues that counsel was deficient because she failed to have the expert talk to him about his extended alcoholism and the effects alcohol had on his mental faculties. In other words, Petitioner wanted the defense to emphasize that, from an early age, he was an alcoholic, he engaged in inappropriate behavior while he was under the influence of alcohol and, when he became sober, he could not remember what he did. Guerra Dec. at ¶¶ 3-5, 21. However, this defense was likely to prejudice the jury against Petitioner because it showed that he knew the effect alcohol had on him and he nevertheless chose to drink in excess. Therefore, counsel's decision not to present the jury with information about Petitioner's past problems with alcohol was a strategic decision that requires deference. See Mayo, 646 F.2d at 375 (difference of opinion about tactical decisions does not constitute ineffective assistance).

United States District Court

For the Northern District of California

Petitioner also argues that the expert failed to testify about the impact of the alcohol on his ability to form the mental state required for conviction.  Pet. at 42.  However, under California law, an expert may not testify whether the defendant had a required mental state.  See Cal. Penal Code § 29.  The determination of whether the defendant had the required mental state, including intent, is decided by the trier of fact.  Id.

Petitioner also faults counsel for failing to investigate his past experiences of alcoholism and alcohol's debilitating effects on him.  As discussed previously, defense counsel made the strategic decision not to emphasize Petitioner's alcoholism and how alcohol affected him in the past.  See Siripongs, 133 F.3d at 734 (court evaluates failure to investigate or produce evidence for "strategic reasonableness").  Furthermore, what was most relevant was the effect alcohol had on Petitioner at the time the offenses occurred.  As Petitioner has diligently pointed out, an abundance of evidence was presented to the jury that he had consumed an enormous amount of alcohol and that it caused him to lose control of his behavior and to have little or no memory of what occurred afterward.  However, even with this evidence the jury determined that Petitioner had the intent required to find him guilty of the specific intent offenses.  More evidence of Petitioner's past wild behavior and blackouts from alcohol likely would not have helped his defense.

Petitioner next faults counsel for failing to question or subpoena witnesses regarding Petitioner's history of alcoholism and the effects of alcohol on his behavior.  With his traverse, Petitioner submits his declaration in which he lists potential witnesses who could testify to his past use of alcohol and its

United States District Court
For the Northern District of California

effects on his mental faculties.  These witnesses are his wife, his sisters, including Cabrera, his cousin and a life-long friend. Petitioner states that he gave counsel the names of these witnesses, but she would not accept them.  Guerra Dec. at ¶ VII. Petitioner also states that, because he is in prison, he is unable to gather the actual declarations from the persons he has listed and requests an evidentiary hearing so these witnesses can be called to testify.  Guerra Dec. at ¶ XXVII.

Although Petitioner presents his own version of the testimony his potential witnesses would provide, it is significant that he presents no declaration from any of them.  Petitioner's argument that he cannot get these declarations because he is in prison is specious because these witnesses are family members and a close friend who, presumably, Petitioner knows how to contact.  In fact, Petitioner lists the addresses and phone numbers for these individuals.

Of course, Petitioner's wife and Cabrera testified at his trial.  Petitioner faults counsel for not questioning them about his past alcoholism when they were called by the prosecution.  It is unlikely that further testimony from them about his past alcoholism would have aided his defense.

Citing California Penal Code section 26(4), Petitioner contends that counsel should have presented the defense that he was unconscious at the time he committed the offenses.  Section 26(4) provides that a person "who committed the act charged without being conscious thereof" is not capable of committing a crime.  However, unconsciousness caused by voluntary intoxication

is governed by California Penal Code section 22.[2]  <u>People v.</u>
<u>Walker</u>, 14 Cal. App. 4th 1615, 1621 (1993).  Section 22 provides,
in relevant part:

> (a) No act committed by a person while in a state of
> voluntary intoxication is less criminal by reason of his or
> her having been in that condition.  Evidence of voluntary
> intoxication shall not be admitted to negate the capacity to
> form any mental states for the crimes charged, including, but
> not limited to, purpose, intent, knowledge, . . . with which
> the accused committed the act.
>
> (b) Evidence of voluntary intoxication is admissible solely
> on the issue of whether or not the defendant actually formed
> a required specific intent . . .

Although voluntary intoxication may lead to unconsciousness,
it does not provide a complete defense under section 26(4); it can
only negate specific intent under section 22.  <u>Walker</u>, 14 Cal.
App. 4th at 1621; see <u>People v. Chaffey</u>, 25 Cal. App. 4th 852, 855
(1994) (distinguishing between unconsciousness as a complete
defense under section 26(4) and unconsciousness as a result of
voluntary intoxication under section 22).  Therefore, because he
was voluntarily intoxicated, the only defense available to
Petitioner was argued by defense counsel, that he had not formed
the intent necessary for the specific intent charges.

The record shows that counsel provided a sound defense on the
other charged offenses.  Counsel presented an expert on police use
of tasers and police excessive force.  RT at 623-83.  She
presented four witnesses who testified that some of the officers
who arrested Petitioner had used excessive force in the past.  RT
at 574-605; 612-23; 684-700; 733-68.

---

[2] In 2012, this section was renumbered section 29.4.  The
Court will refer to it as section 22.

United States District Court
For the Northern District of California

In light of defense counsel's active and diligent representation, the state court's determination that she provided competent assistance was not objectively unreasonable.  Habeas relief is precluded because "fairminded jurists could disagree" on the correctness of the state court's decision.  See Harrington, 131 S. Ct. at 785.  Accordingly, Petitioner's ineffective assistance of counsel claim is denied.

III. Evidentiary Hearing

Petitioner requests an evidentiary hearing and appointment of counsel "to gather information in support of the facts contained in Petitioner's declaration and obtain the declarations of witnesses who defense counsel refused to obtain at the time of trial."  Trav. at 26.  Petitioner is entitled to an evidentiary hearing on disputed facts if his allegations, if proven, would entitle him to relief.  Perez v. Rosario, 459 F.3d 943, 954 n.5 (9th Cir. 2006); Williams v. Calderon, 52 F.3d 1465, 1484 (9th Cir. 1995).

An evidentiary hearing is not required.  Even if Petitioner's proposed witnesses testify as he asserts they will, his claim of ineffective assistance of counsel will still fail because counsel's performance, as discussed in detail above, was not deficient.  See Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991) (no hearing required if allegations, viewed against the record, fail to state a claim for relief).

Accordingly, Petitioner's request for an evidentiary hearing is denied.

IV. Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition

27

United States District Court
For the Northern District of California

to grant or deny a certificate of appealability in the ruling.
Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.

A petitioner may not appeal a final order in a federal habeas corpus proceeding without first obtaining a certificate of appealability.  28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).  A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The certificate must indicate which issues satisfy this standard.  28 U.S.C. § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).

The Court finds that reasonable jurists would not find its assessment of any claim debatable or wrong.  Therefore, a certificate of appealability is denied.

Petitioner may not appeal the denial of a certificate of appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure.  See Rule 11(a) of the Rules Governing Section 2254 Cases.

CONCLUSION

Based on the foregoing, the Court orders as follows:

1. The petition for a writ of habeas corpus and a certificate of appealability are denied.

2. The request for an evidentiary hearing is denied.

3. The Clerk of the Court shall enter a separate judgment and close the file.

IT IS SO ORDERED.


Dated: 3/7/2014

CLAUDIA WILKEN
UNITED STATES DISTRICT JUDGE